THE JOHN A. BRIGGS.

BALCH v. ONE MILLION TWO HUNDRED AND SIXTY-ONE THOUSAND FEET OF LUMBER.

(District Court, E. D. Pennsylvania. February 14, 1902.)

Nos. 57, 60.

SHIPPING—NEGLIGENT LOADING OF VESSEL—DAMAGES TO CHARTERER.

Evidence considered, and *held* to sustain the claim of a charterer that a cargo of timber was improperly stowed by the master, by reason of which the full carrying capacity of the vessel was not utilized, and the charterer, who paid a lump sum as charter hire for the voyage, sustained loss for which he was entitled to damages.

In Admiralty. Suit by charterer to recover damages for failure of ship to carry a full cargo, and cross libel for demurrage.

Horace L. Cheyney and John F. Lewis, for the John A. Briggs.

Theodore M. Etting and Jones, Carson & Beeber, for the charterer.

J. B. McPHERSON, District Judge. These cross libels disclose a dispute between a ship and her charterers, the ship being charged with improper stowage of a cargo of timber, whereby the carrying capacity of the vessel was not fully utilized; and the charterers being charged with failure to deliver the cargo properly, whereby delay occurred, and a liability for demurrage arose. The testimony is voluminous and conflicting, and will support the theory of either party. It has not been easy to reach a conclusion, but, on the whole, it seems to me that the weight of the evidence is against the ship, and I have therefore adopted, with modifications, the findings of fact proposed by the charterers. Thus modified, they are as follows:

I. The Pacific Pine Company, a California corporation engaged in the lumber business, having orders from the Atlantic seaboard for lumber of various sizes, amounting in the aggregate to 1,470,000 feet, the acceptance of which was dependent upon their ability to charter a suitable vessel, entered upon negotiations with the managing owner of the ship John A. Briggs for the charter of that vessel. The negotiations resulted in the execution of a charter party, under whose terms the vessel was let unto the Pacific Pine Company for the carriage of "a full cargo of sawn lumber and timber" from one or two safe loading places on Puget Sound, as might be ordered by the charterers, to Philadelphia or New York, the consideration being the lump sum of $23,500. The timber was to be "of such length and sizes as can be taken through vessel's present hatchways or bow or stern ports, if any, and on deck," these ports to be large enough to receive timber 24x24 inches square. The cargo was to be stowed under the captain's supervision and direction, and the stevedore employed by the vessel was to be mutually satisfactory to the captain and charterers or their agents. Thirty-two working days were allowed for loading, this period to begin "twenty-four hours after vessel is at loading place designated by charterers or their agents, her inward cargo or unnecessary ballast discharged, and she is ready to receive cargo, and captain

has notified them in writing to that effect." For each day's detention "by default of [the charterers]," $120 in gold was to be paid.

2. The charterers divided the cargo to be shipped between two mills, one at Port Gamble and one at Port Blakeley, both on Puget Sound. A duplicate order was given to each mill, this being a customary and proper division, and Port Gamble was named as the first place of loading. On the arrival of the ship from the voyage on which she was engaged when the contract was made, she was ordered to Port Gamble, where she arrived on December 12, 1900. The charterers intended to ship from Port Gamble 735,000 feet of lumber, and of this amount 250,000 feet had been already cut, and was stored upon the wharf. The vessel did not report herself in readiness to receive cargo until December 21st, by which time the amount of lumber cut and on the wharf had increased to nearly 600,000 feet. This quantity was made up of lumber and timber of various dimensions and sizes: 125,000 feet was decking, 2x4 to 4x6 inches, averaging 32 feet in length; 75,000 feet was boards, 1x6, 12 to 16 feet long; and 535,000 feet was heavy timber, of different lengths and sizes, running from 10x12 in breadth and thickness, and 50 to 85 feet in length, to 26x26, and 40 to 50 feet in length, some sticks being even longer. When the vessel reported her readiness to receive cargo, the charterers tendered the 600,000 feet already on the wharf. All the boards and decking, and nearly all the timber of heavier and larger sizes, had been cut. About 150,000 feet was still to be cut, and this was for the most part made up of the smaller sizes of the large timber. The cargo was piled on the wharf, end on to the ship. All sizes, from 10x12 upward, were placed in one solid pile about 50 feet in length and 15 or 16 feet high. The boards and decking were intended to be used for stowage, and for loading under the poop. They were separately piled alongside the timber. Toward the eastern end of the pile some boards and decking were on top of the timber, but at least 50 feet of the timber was clear of this small lumber. The larger and heavier sizes of the timber, speaking generally, were at the bottom of the pile, and the smaller sizes on the top. It is neither practicable nor customary to pile each size separately. The larger and longer sizes are usually cut first, so that, if any imperfections appear, the timber can be cut shorter or planed down, and thus utilized for smaller sizes. The sticks are piled on the wharf as they are cut. In the present case, the practice usually observed was followed.

3. The lower hold of the ship had a carrying capacity of about 450,000 feet, and the lower between-decks could carry a similar amount. As 750,000 feet was to be shipped at Port Gamble, it was necessary to use both these spaces. Under such conditions, the proper practice would have been to load both at the same time, putting the sticks either in the hold or in the lower between-decks, as their dimensions might require, and filling up the vacant spaces with boards and decking. Captain Balch, the master of the ship, did not pursue this course for two reasons: First, he was ordered by his owners to stow the lower hold first; and, second, he himself believed—honestly, no doubt, but none the less mistakenly—that none of the timber that was on top of the pile was of such dimensions as to admit of stowage

in the lower hold through the vessel's hatchways and ports. He therefore declared his inability to receive any part of the cargo tendered, and for three weeks he made no effort by actual experiment to ascertain whether any of the timber accessible would go into the vessel or not, but simply rested upon his belief that the timber which was on the top of the pile could not be used. On January 15th, under changed orders from his owners, for the first time he accepted the cargo, and began the loading of his vessel by putting more than 100,000 feet of the boards and decking, which had been intended for stowage, in the bottom of the lower hold and in the wings, where larger and heavier timber should have been placed. After this had been done, he then for the first time endeavored to take the larger and heavier timber, and found immediately that he had been mistaken in supposing that he could not load the timber that had been offered. Working from the top of the pile down, he had no difficulty between January 15th and February 6th in taking on board all of the timber which was on the wharf at the time when he reported his readiness to receive cargo, together with more than 150,000 feet that was cut and delivered thereafter.

4. To stow such a cargo as this properly, dunnage should be laid on top of the ballast. Heavy timber should then be placed on top of the dunnage, and the boards and decking should be used wherever the lengths of the timber sticks are such as to leave unfilled spaces. The smaller lumber—the boards and the decking—should also be used to fill the spaces between the beams that separate the lower between-decks from the lower hold. The material thus used is technically known as "beam filling." The loading of the two lower decks of the ship was nearly finished at Port Gamble. A little additional lumber was placed on these decks after she arrived at Port Blakeley.

The loading of the ship at Port Gamble was defective in the following respects:

(1) The ballast was improperly trimmed, causing the vessel to be considerably down by the stern, in consequence of which it was found impracticable to stow cargo properly under her poop deck.

(2) There was no beam filling whatever between her beams, although this might have been put in, if the stowing had been skillfully done.

(3) There were numerous empty spaces in the lower hold and the lower between-decks. The condition of the vessel on her arrival at Port Blakeley is technically known as "blown up."

In consequence of the trim of the vessel, the marine surveyors would not permit her to be loaded at Port Blakeley with her proper complement of cargo, either on deck or under the poop, and of the 735,000 feet of lumber intended by the charterers to be shipped from Port Blakeley it was found practicable to load the vessel with no more than 526,980 feet. This quantity, together with the 735,000 feet theretofore received at Port Gamble, made up a cargo of 1,261,980 feet; and this was carried by the vessel from Puget Sound to Philadelphia, and was there delivered, upon payment of the full charter money, to the persons entitled to receive it.

5. Before the charter was agreed to, the managing owner had stated how much lumber the ship had carried on previous voyages, and upon inquiry these statements had been confirmed. Upon the voyages referred to she had carried the following cargoes of lumber:

From Puget Sound to Sydney, 1,555,823 feet.

From Puget Sound to Plymouth, 1,430,000 feet.

From Puget Sound to South Africa, 1,483,000 feet.

The lumber carrying capacity of the vessel is estimated by Capt. Balch as follows:

| | |
|---|---|
| Lower hold | 450,000 feet. |
| Lower between-decks | 450,000 " |
| Upper between-decks | 450,000 " |
| Deck load | 90,000 " |
| Poop stowage | 30.000 " |
| Making a total of | 1,470,000 " |

Upon her arrival at Philadelphia, the vessel was, at the instance of the charterers, examined by two expert stevedores. One of them examined her before any of the lumber had been discharged. The other was sent over from New York, and did not arrive until after the upper between-decks, the lower between-decks, the deck load, and the poop had been discharged. The testimony of the former witness is that, if properly laden, the ship could have carried about 238,000 additional feet of cargo. The testimony of the New York stevedore is confined to the lower hold, and to the loss occasioned by the absence of beam filling therein. This he estimated at more than 100,000 feet.

6. After the cargo had been discharged and was on the wharf, and after the vessel had been attached for improper stowage, the master of the ship brought a counter suit for delay at the port of loading. Upon this point, without referring to the evidence in detail, it seems to me to be enough to say that at no time after the vessel was reported to be ready for loading was there any delay occasioned by default of the charterers, their agents or servants. On the contrary, after deducting from the time consumed in actual loading such time as cannot properly be charged against the charterers, the cargo was put on board in less time than is allowed by the contract. As already stated, the delay of three weeks that occurred before the loading began was due to the fault of the ship.

7. If properly loaded, the ship could have carried 1,470,000 feet of lumber. The quantity actually carried was only 1,261,980 feet. There was therefore a deficiency of cargo, due to the improper disposition of the ballast and the bad stowage of the cargo, and for the loss thus occasioned the ship must be held liable.

The measure of damages is the difference between the price at Port Blakeley of the lumber that the ship could have carried if she had been properly stowed and the contract price of such lumber at Philadelphia, less the cost of carriage, with interest from the day when the contract price would have been paid. The record does not contain testimony that enables me to compute the sum due, and therefore (unless the parties can agree upon the amount) a commissioner must be appointed.

It may be proper to add that after the dispute arose at Port Gamble the evidence shows clearly that both parties expected a lawsuit to follow, and were anxious to lose no point that might be of advantage. Either, I dare say, was willing to shift his ground if something might perhaps be gained thereby, and the correspondence shows the irritated watchfulness on both sides that might, under such circumstances, be looked for. As I regard the case, however, these maneuvers for position are not of great importance. The determining facts are the owner's mistaken direction to the master to load the lower hold first, and the master's mistaken belief that he was not able to take on board the timber that for three weeks was always at his command.

In No. 60 the libel is dismissed. In No. 57 the libelant is entitled to a decree. In view of the closely balanced testimony, the costs in both cases will be divided.